IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-39,706-03






EX PARTE WILLIE EARL PONDEXTER, JR.









ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
AND MOTION FOR STAY OF EXECUTION FROM CAUSE NO. 183CR1293-HC
IN THE 102ND JUDICIAL DISTRICT COURT

RED RIVER COUNTY




 Cochran, J., filed a concurring statement 

 

 I join the Court's Order dismissing applicant's subsequent application for a writ of
habeas corpus. All four of the claims within applicant's last-minute filing are procedurally
barred and without arguable merit. Although there may be times in which a death row inmate
must, by necessity, file a subsequent writ application at the last moment and request a stay
of execution, the present application does not surmount the threshold hurdle of Article
11.071, §5. 

 In his first claim, applicant asserts that his death sentence violates the Eighth and
Fourteenth Amendments because it is based in part "on false testimony, the falsity of which
was only recently discovered." What applicant fails to tell this Court, however, is that he
made precisely this same claim in his original writ, the only difference being that he
submitted a different handwritten document that purports to show the "falsity" of a
punishment witness's testimony.

 One of the witnesses at the punishment stage of applicant's trial was Linda Joyce
Thomas. Ms. Thomas testified that, on October 10, 1993, eighteen days before the capital
murder, applicant and three fellow gang members (1) attacked her as she was returning home
from a club. She identified applicant as the man who grabbed her by the neck and then
stabbed her in the head, lungs, and stomach with scissors. She was stabbed eight times. She
suffered puncture wounds to her lungs and stomach. She had three holes punched in her
head. She lost five teeth. Her face and nose were crushed. This evidence, argued the
prosecutor, helped to show that applicant would be a future danger.

 In his first writ application, applicant claimed that Ms. Thomas had lied at trial. He
attached a handwritten, unsigned document that was purportedly written by his father stating,

 Linda Thomas told me she lied during the punishment phase of Willie
Pondexter's trial. Linda told me she testified at Willie Pondexter's trial at the
urging of the Idabel police. Linda said she had problems with Idabel Police
and agreed to testify against Willie if they would cut her some slack, she said
her testimony that Willie Pondexter assaulted her in Idabel Oklahoma was a
lie.


The trial judge rejected this claim. Presumably he did not find this handwritten document
authentic, credible, or reliable. 

 In this subsequent writ, applicant now attaches another handwritten document that
purports to be written by a "Chester Smith" who fails to give any address, phone number, or
other self-identifying information. He writes, 

 I grew up with Willie Earl Pondexter Jr. and could easily identify him by sight.


 On October 10, 1993, I was present at the stabbing and beating of Linda Joyce
Thomas. Willie Earl Pondexter Jr. was not there at the time of the attack, and
he did not participate in any way.


 I did not testify at Willie's murder trial. No one interviewed me about the
stabbing of Linda Thomas and no one asked me to testify. If someone had
approached me, I would have testified at the trial that Willie was not present
at the stabbing. (2)


And just who is "Chester Smith" and where did he come from? And where did this
document come from? And how did applicant's counsel happen to obtain it at this late date? 
There is no explanation in the application concerning the provenance of this document or any
explanation as to why it could not have been obtained at the time applicant filed his first writ
if he was aware, back in 1997, that Ms. Thomas had "lied" in her trial testimony. (3) On its
face, this document fails to inspire confidence in its authenticity, accuracy, or credibility. 
Applicant has failed to make a prima facie showing of new facts sufficient to clear the
Section 5 bar on subsequent applications.

 In his second claim, applicant asserts that his death sentence is unconstitutionally
unreliable because he has not been violent during the past fourteen years on death row. (4) 
Once again, applicant fails to explain how this claim passes over the 11.071, § 5 bar to
subsequent writ applications except to state that "the factual basis of the claim was not
previously available." Presumably that is because, at the time of trial, applicant had not yet
been on death row for fourteen years. But the "future dangerousness" question is determined
by the jury at the capital murder trial based upon the extant evidence at that time, not upon
a re-evaluation after a few years on death row. (5) Although a particular death row inmate may
behave in an exemplary manner after conviction and sentence, evidence of that fact does not
negate the jury's original verdict. Furthermore, applicant has been in the highly confined
atmosphere of a death row prison cell; lack of violence in that environment is not necessarily
indicative of lack of violence in free society or in the less structured general prison
population in which gangs, including the Crips, seek to commit acts of violence. More
importantly, evidence of post-sentencing remorse, reformation, good works, and other
positive character traits are perfectly suited for consideration by the Board of Pardons and
Paroles and the Governor in a request for clemency. (6) Reformation and rehabilitation are the
primary reasons for exercising executive clemency; they are not the basis of a writ of habeas
corpus alleging unconstitutional confinement. Applicant's "exemplary" disciplinary record
while on death row during the pendency of the appellate process does not prove that his
original conviction or sentence was unconstitutional. Applicant's claim is not cognizable
under Texas habeas corpus law, nor does it surmount the Section 5 bar on subsequent
applications.

 In his third claim for relief, applicant alleges that the admission of evidence of
uncharged misconduct during the punishment phase of his trial violated his right to a reliable
sentencing determination under the Eighth and Fourteenth Amendments. Once again,
applicant fails to explain why this claim could not have been brought at trial, on direct
appeal, or in his initial application for a writ of habeas corpus except to say, "This claim
satisfies art. 11.071 § 5(a)(1) because the legal basis of the claim was not previously
available." He relies upon a Supreme Court decision dealing with punitive damages in a
personal injury lawsuit. (7) This is not "new law" for purposes of Article 11.071, § 5. 

 In his fourth and final claim, applicant alleges that the State violated his right to due
process because it adopted factually inconsistent theories of which bullet applicant shot at
the murder victim and which bullet his co-defendant shot. Once again, applicant has merely
recited that this factual claim did not become available until the conclusion of the original
state habeas proceedings. Once again, applicant has not satisfied the Section 5 bar against
subsequent applications.

 According to the medical examiner, Ms. Lennox, the capital murder victim, was twice
shot in the head. Both shots were fatal. (8) One bullet-the "jaw" bullet-entered through the left
side of her skull, went into her mouth, her tongue, struck and shattered her right jawbone, and
exited beneath her left ear. The other bullet-the "brain" bullet-entered through her forehead,
went through her brain, and came out the back of her head. It was undisputed that
applicant's co-defendant shot Ms. Lennox first, and applicant shot second.

 Applicant asserts that, at the trial of his co-defendant, James Henderson, the
prosecutor's theory was that Henderson shot the "brain" bullet and applicant shot the "jaw"
bullet. But at applicant's trial, the State argued that applicant shot the "brain" bullet after
Henderson shot the "jaw" bullet. Applicant asserts that if he shot Ms. Lennox after
Henderson's "brain" bullet had already killed her, he was not guilty because "he would not
have acted 'intentionally.'" (9) 

 Under Texas law, the order of the fatal bullets is legally immaterial to applicant's
criminal liability. Although the jury was not charged under the law of parties, that was
unnecessary because the jury was charged under Section 6.04 concerning concurrent
causation. (10) The jury charge read: "You are instructed that a person is criminally responsible
if the result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly sufficient to
produce the result and the conduct of the actor clearly insufficient." 

 Thus, only if Henderson's bullet (regardless of whether it was the "brain" or "jaw"
bullet) was clearly sufficient to cause Ms. Lennox's death and applicant's bullet (regardless
of whether it was the "brain" or "jaw" bullet) was clearly insufficient to cause her death,
would applicant have a legitimate claim. For example, if one of the bullets grazed Ms.
Lennox's little finger while the other one fatally entered her brain, then it obviously matters
a great deal which defendant shot which bullet. Here, however, either shot was fatal, both
of them in combination were fatal, and there is no evidence that either bullet was "clearly
insufficient" to cause Ms. Lennox's death. Applicant's claim has no basis in law or fact. 
More importantly, this claim was available at trial, on direct appeal, and at the time of his
first habeas application. (11) It is procedurally defaulted under Texas law.

 In sum, consideration of the merits of all of applicant's claims is barred by Article
11.071, § 5. Moreover, courts may take into account the last-minute nature of equitable
requests for a stay of execution. (12) Just because Texas law permits an inmate to file a last-minute subsequent application for a writ of habeas corpus and request a stay of execution
does not mean that every death row inmate must file one. 


Filed: March 2, 2009

Do Not Publish 
1. Testimony was admitted during the guilt stage of applicant's trial concerning
applicant's gang membership and that he and several of his accomplices had, throughout
the night of the murder, talked about which Crip "had the heart" to do what they were
planning to do to "the old lady" that they killed. 
2. The signature of "Chester Smith" does not appear to be in the same handwriting
as the rest of the document.
3. Applicant's sole statement concerning article 11.071, § 5 is as follows: "This
claim satisfies art. 11.071 § 5(a)(1) because the factual basis of the claim was not
previously available." 
4. Applicant does admit that he once tried to escape from death row, but that was
years ago and did not involve actual violence. 
5. Applicant analogizes his due process right to re-evaluation of his propensity for
violence to periodic judicial review of those committed under sexually violent predator
acts (SPVA). See, e.g., Tex. Health & Safety Code § 841.001et seq. The two situations
are not analogous. Under Texas law, a person involuntarily committed under an SPVA
order must be released once he no longer poses a danger to society. Texas law does not
provide that a capital murderer sentenced to death will be released once he no longer
poses a danger to society. 
6. Indeed, applicant states that he has compiled such evidence for submission with
his clemency petition to the Governor.
7. Applicant analogizes the reasoning in the Supreme Court decision in Philip
Morris USA v. Williams, 549 U.S. 346 (2007) to the evidence that is admitted under
Texas statutes in criminal trials. The two situations are not analogous. In Philip Morris,
the Supreme Court held that "the Constitution's Due Process Clause forbids a State to use
a punitive damages award to punish a defendant for injury that it inflicts upon
nonparties[.]" Id. at 353. But the special issues in the punishment phase of a capital
murder trial do not ask the jury to punish the defendant for injury he inflicts upon
nonparties. It asks whether the defendant is likely to commit future acts of violence and
whether there are any mitigating circumstances that call for a punishment less than death. 
Article 37.071, §2(a)(1) provides, in relevant part, that "in the [punishment phase of a
capital offense], evidence may be presented . . . as to any matter that the court deems
relevant to sentence." Evidence of the defendant's acts of violence against other specific
individuals who testify to their injuries are simply some indication of a defendant's past
acts of violence that may (or may not) indicate the likelihood for future acts of violence. 
Such evidence has long been admissible in under state law in Texas capital murder
punishment trials. See Hughes v. State, 24 S.W.3d 833, 843 (Tex. Crim. App. 2000). 
8. The medical examiner testified that both of these wounds "are killing wounds. 
Both could be fatal wounds. Either of these [wounds] could have killed her." On cross-examination, the medical examiner stated, "It's my opinion that she died as a combination
of these two wounds."
9. The evidence at trial showed that one accomplice, Deon Williams, stole seven
dollars from Ms. Lennox's coin purse, then Henderson shot her in the head and handed
the gun to applicant who also shot Ms. Lennox in the head. Thus, the shots, though not
simultaneous, were only seconds apart. One of applicant's defensive theories at trial was
that Mrs. Lennox died instantly from Henderson's shot, thus his shot did not cause her
death. According to this theory, his shot was just abuse of a corpse. The jury rejected
this theory. The state habeas judge's factual findings at the original writ hearing include
the following: "Based on the greater weight of the evidence in this proceeding, the court
finds that the victim was alive at the time both shots were fired into the victim and that
each shot contributed to her death."
10. Tex. Penal Code § 6.04(a) ("A person is criminally responsible if the result
would not have occurred but for his conduct, operating either alone or concurrently with
another cause, unless the concurrent cause was clearly sufficient to produce the result and
the conduct of the actor clearly insufficient.").
11. Applicant did, in fact, raise this same basic "inconsistent theories" claim in his
federal habeas application, although he failed to do so in his first Texas habeas
application. It was rejected by the federal district court and by the Fifth Circuit. 
Pondexter v. Quarterman 537 F.3d 511, 526-27 (5th Cir. 2008) ("It is well-established
that the use of inconsistent theories in the separate trials of co-defendants is not a
violation of the due-process clause.").
12. See, e.g., Gomez v. U.S. District Court for the Northern District of California,
503 U.S. 653, 653-54 (1992) (even assuming that consideration of the merits of a late-filed stay of execution and habeas petition was not barred by prior precedent, Supreme
Court would not consider the merits because applicant sought an equitable remedy and
"[e]quity must take into consideration the State's strong interest in proceeding with its
judgment and [applicant's] obvious attempt at manipulation"; stating, "A court may
consider the last-minute nature of an application to stay execution in deciding whether to
grant equitable relief."); Hill v. McDonough, 547 U.S. 573, 584 (2006) (a court
considering a stay of execution "must also apply 'a strong equitable presumption against
the grant of a stay where a claim could have been brought at such a time as to allow
consideration of the merits without requiring the entry of a stay.").